Katalina Baumann (SBN 278606)
katalina.baumann@troutman.com
**TROUTMAN PEPPER HAMILTON SANDERS LLP**
5 Park Plaza, Suite 1400
Irvine, CA 92614
Telephone: (949) 622.2700
Facsimile: (949) 622.2739

Attorneys for Defendant
Westlake Portfolio Management, LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TAMIKA HUESTON, BUNDY LANEY, CECILY MOODY, JATTIYA DAVIS, and DANIELLE CAINES on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>WESTLAKE PORTFOLIO MANAGEMENT, LLC,<br><br>Defendant. | Case No. 5:24-cv-00380-JGB-SHK<br><br>**DECLARATION OF JOHN SCHWARTZ IN SUPPORT OF DEFENDANT WESTLAKE PORTFOLIO MANAGEMENT, LLC'S MOTION TO COMPEL ARBITRATION**<br><br>Date:  May 27, 2024<br>Time:  9:00 A.M.<br>Courtroom:  1<br>Location:  3470 Twelfth Street, Riverside, CA 92501<br>Judge:  Hon. Jesus G. Bernal<br>Complaint filed:  February 6, 2024 |

I, John Schwartz, hereby declare as follows:

1. I am a Senior Legal Analyst at Westlake Portfolio Management, LLC ("WPM"), which is headquartered in Los Angeles, California. WPM services auto finance accounts throughout the country, including those at issue in this action.

2. I have worked with WPM or its parent company and affiliates in different capacities for over 23 years. In connection with my employment, I have personal knowledge of the general business practices of WPM. I am authorized to provide this declaration for WPM. I have access to the business records relating to contracts and accounts serviced by WPM, including the applicable financing agreements.

3. The exhibits to this declaration are all true and correct business records created and maintained by WPM, its principals, or its affiliates in the course of regularly conducted business activity. Creating and maintaining these records is part of the regular practice of WPM, its principals, and affiliates, and the records were made at the time of the act, transaction, occurrence, or event, or within a reasonable time thereafter. Certain exhibits have been redacted to protect the confidentiality of account information, such as account numbers.

4. The statements in this declaration are based on my personal knowledge and review of WPM's records, including records pertaining to the accounts of Plaintiffs Tamika Hueston, Bundy Laney, Cecily Moody, Jattiya Davis, and Danielle Caines (collectively, "Plaintiffs"). If called as a witness, I am competent to testify to the statements in this declaration.

**A.  Hueston's Account Records**

5. WPM's records reflect that, on or about February 20, 2023, a purchase agreement was entered into between Tamika Hueston ("Hueston") and U.S. Auto Sales, Inc. ("U.S. Auto Sales") in connection with the financing of her purchase of a 2017 Nissan Versa, VIN 3N1CN7AP9HL894410. Attached as **Exhibit 1** is a true and correct copy of the purchase agreement with Hueston.

DECLARATION OF JOHN SCHWARTZ IN SUPPORT OF MOTION TO COMPEL ARBITRATION

6. Pursuant to this purchase agreement, Hueston expressly "acknowledge[d] that [Hueston] and [U.S. Auto Sales] have signed a separate arbitration agreement. That agreement [was t]hereby attached and the terms are incorporated into the terms of [the purchase agreement.]" Ex. 1 at 2 ¶ 10. In addition, the purchase agreement informed Hueston that "[i]f [she was] buying the Vehicle in a credit sale transaction with [U.S. Auto Sales] evidenced by a signed retail installment sales contract, [the purchase agreement] becomes binding when [she] sign[ed] it and the retail installment sales contract." *Id.* at 3.

7. WPM's records reflect that Hueston also executed a motor vehicle retail installment sales contract ("RISC") in connection with her financing of a vehicle purchase. Attached as **Exhibit 2** is a true and correct copy of the RISC with Houston.

8. The RISC provides that "Federal and Florida law apply to this contract." *Id.* at 6.

9. As with the purchase agreement, the RISC required Hueston to expressly "acknowledge that [she] and [U.S. Auto Sales] have signed a separate arbitration agreement. That agreement [was t]hereby attached and the terms incorporated into the terms of [the RISC.]" *Id.* at 7.

10. The RISC further provides that it was assigned to U.S. Auto Finance on the same day that Hueston purchased the subject vehicle. *Id.*

11. WPM's records further reflect that Hueston also executed an arbitration agreement in connection with the purchase agreement. Attached as **Exhibit 3** is a true and correct copy of the arbitration agreement between Hueston and U.S. Auto Sales.

**B.  Laney's Account Records**

12. WPM's records reflect that, on or about April 14, 2023, a purchase agreement was entered into between Bundy Laney ("Laney") and U.S. Auto Sales. Attached as **Exhibit 4** is a true and correct copy of the purchase agreement with Laney.

- 3 -
DECLARATION OF JOHN SCHWARTZ IN SUPPORT OF MOTION TO COMPEL ARBITRATION

13. Pursuant to this purchase agreement, Laney expressly "acknowledge[d] that [Laney] and [U.S. Auto Sales] have signed a separate arbitration agreement. That agreement [was t]hereby attached and the terms are incorporated into the terms of [the purchase agreement.]" Ex. 4 at 2 ¶ 10. In addition, the purchase agreement informed Laney that "[i]f [he was] buying the Vehicle in a credit sale transaction with [U.S. Auto Sales] evidenced by a signed retail installment sales contract, [the purchase agreement] becomes binding when [he] sign[ed] it and the retail installment sales contract." *Id.* at 3.

14. WPM's records reflect that Laney also executed a RISC in connection with her financing of a vehicle purchase. Attached as **Exhibit 5** is a true and correct copy of the RISC with Laney.

15. The RISC provides that "Federal and Georgia law apply to this contract." *Id.* at 5.

16. As with the purchase agreement, the RISC required Laney to expressly "acknowledge that [he] and [U.S. Auto Sales] have signed a separate arbitration agreement. That agreement [was t]hereby attached and the terms incorporated into the terms of [the RISC.]" *Id.* at 6.

17. The RISC further provides that it was assigned to U.S. Auto Finance on the same day that Laney purchased the subject vehicle. *Id.*

18. WPM's records further reflect that Laney also executed an arbitration agreement in connection with the purchase agreement. Attached as **Exhibit 6** is a true and correct copy of the arbitration agreement between Laney and U.S. Auto Sales.

**C.   Moody's Account Records**

19. WPM's records reflect that, on or about June 29, 2022, a purchase agreement was entered into between Cecily Moody ("Moody") and U.S. Auto Sales. Attached as **Exhibit 7** is a true and correct copy of the purchase agreement with Moody.

20. Pursuant to this purchase agreement, Moody expressly "acknowledge[d] that [Moody] and [U.S. Auto Sales] have signed a separate arbitration agreement. That agreement [was] hereby attached and the terms are incorporated into the terms of [the purchase agreement.]" Ex. 7 at 2 ¶ 10. In addition, the purchase agreement informed Moody that "[i]f [she was] buying the Vehicle in a credit sale transaction with [U.S. Auto Sales] evidenced by a signed retail installment sales contract, [the purchase agreement] becomes binding when [she] sign[ed] it and the retail installment sales contract." *Id.* at 3.

21. WPM's records reflect that Moody also executed a RISC in connection with her financing of a vehicle purchase. Attached as **Exhibit 8** is a true and correct copy of the RISC with Moody.

22. The RISC provides that "Federal and South Carolina law apply to this contract." *Id.* at 5.

23. As with the purchase agreement, the RISC required Moody to expressly "acknowledge that [she] and [U.S. Auto Sales] have signed a separate arbitration agreement. That agreement [was t]hereby attached and the terms incorporated into the terms of [the RISC.]" *Id.* at 6.

24. The RISC further provides that it was assigned to U.S. Auto Finance on the same day that Moody purchased the subject vehicle. *Id.*

25. WPM's records further reflect that Moody also executed an arbitration agreement in connection with the purchase agreement. Attached as **Exhibit 9** is a true and correct copy of the arbitration agreement between Moody and U.S. Auto Sales.

**D.   Davis's Account Records**

26. WPM's records reflect that, on or about January 13, 2023, a purchase agreement was entered into by Jattiya Davis ("Davis"). Attached as **Exhibit 10** is a true and correct copy of the purchase agreement with Davis.

27. Pursuant to this purchase agreement, Davis expressly "acknowledge[d] that [Davis] and [U.S. Auto Sales] have signed a separate arbitration agreement. That

- 5 -

agreement [was] hereby attached and the terms are incorporated into the terms of [the purchase agreement.]" Ex. 10 at 2 ¶ 10. In addition, the purchase agreement informed Davis that "[i]f [she was] buying the Vehicle in a credit sale transaction with [U.S. Auto Sales] evidenced by a signed retail installment sales contract, [the purchase agreement] becomes binding when [she] sign[ed] it and the retail installment sales contract." *Id.* at 3.

28. WPM's records reflect that Davis also executed a RISC in connection with her financing of a vehicle purchase. Attached as **Exhibit 11** is a true and correct copy of the RISC with Davis.

29. The RISC provides that "Federal and North Carolina law apply to this contract." *Id.* at 5.

30. As with the purchase agreement, the RISC required Davis to expressly "acknowledge that [she] and [U.S. Auto Sales] have signed a separate arbitration agreement. That agreement [was t]hereby attached and the terms incorporated into the terms of [the RISC.]" *Id.* at 6.

31. The RISC further provides that it was assigned to U.S. Auto Finance on the same day that Davis purchased the subject vehicle. *Id.*

32. WPM's records further reflect that Davis also executed an arbitration agreement in connection with the purchase agreement. Attached as **Exhibit 12** is a true and correct copy of the arbitration agreement between Davis and U.S. Auto Sales.

**E.  Caines's Account Records**

33. WPM's records reflect that, on or about October 13, 2022, a purchase agreement was entered into by Danielle Caines ("Caines"). Attached as **Exhibit 13** is a true and correct copy of the purchase agreement with Caines.

34. Pursuant to this purchase agreement, Caines expressly "acknowledge[d] that [Caines] and [U.S. Auto Sales] have signed a separate arbitration agreement. That agreement [was] hereby attached and the terms are incorporated into the terms of [the purchase agreement.]" Ex. 13 at 2 ¶ 10. In addition, the purchase agreement informed

Caines that "[i]f [she was] buying the Vehicle in a credit sale transaction with [U.S. Auto Sales] evidenced by a signed retail installment sales contract, [the purchase agreement] becomes binding when [she] sign[ed] it and the retail installment sales contract." *Id.* at 3.

35. WPM's records reflect that Caines also executed a RISC in connection with her financing of a vehicle purchase. Attached as **Exhibit 14** is a true and correct copy of the RISC with Caines.

36. The RISC provides that "Federal and Alabama law apply to this contract." *Id.* at 5.

37. As with the purchase agreement, the RISC required Caines to expressly "acknowledge that [she] and [U.S. Auto Sales] have signed a separate arbitration agreement. That agreement [was t]hereby attached and the terms incorporated into the terms of [the RISC.]" *Id.* at 6.

38. The RISC further provides that it was assigned to U.S. Auto Finance on the same day that Caines purchased the subject vehicle. *Id.*

39. WPM's records further reflect that Caines also executed an arbitration agreement in connection with the purchase agreement. Attached as **Exhibit 15** is a true and correct copy of the arbitration agreement between Caines and U.S. Auto Sales.

F. **The Arbitration Agreement**

40. The arbitration agreements attached as Exhibits 3, 6, 9, 12, and 15 all provide as follows:

**ARBITRATION AGREEMENT**

**This Arbitration Agreement significantly affects your rights in any dispute with us. Please read this Arbitration Agreement carefully before you sign it.**

1. EITHER YOU OR WE MAY CHOOSE TO HAVE ANY DISPUTE BETWEEN US

**DECIDED BY ARBITRATION AND NOT IN COURT.**

**2. IF A DISPUTE IS ARBITRATED, YOU AND WE WILL EACH GIVE UP OUR RIGHT TO A TRIAL BY THE COURT OR A JURY TRIAL.**

**3. <u>IF A DISPUTE IS ARBITRATED, YOU WILL GIVE UP YOUR RIGHT TO PARTICIPATE AS A CLASS REPRESENTATIVE OR CLASS MEMBER ON ANY CLASS CLAIM YOU MAY HAVE AGAINST US.</u>**

Exs. 3, 6, 9, 12, 15 at 1.

41. The arbitration agreements further provide:

> Any claim or dispute, whether in contract, tort or otherwise (including the interpretation and scope of this clause and the arbitrability of any issue), between you and us or our employees, agents, successors or assigns, which arises out of or relates in any manner to the purchase, financing, or lease of your vehicle or any resulting transaction or relationship (including any such relationship with third parties who do not sign this Arbitration Agreement, such as an assignee of the Contract or Lease Agreement) shall, at your or our election (or the election of any such third party), be resolved by neutral, binding arbitration and not by a court action. Any claim or dispute is to be arbitrated on an individual basis and not as a class action. **You expressly waive any right you may have to arbitrate a class action. This is called the "class action waiver."**

Exs. 3, 6, 9, 12, 15 at 1.

42. The arbitration agreements further provide that "[a]ny arbitration under this Arbitration Agreement shall be governed by the Federal Arbitration Act (9 U.S.C. § 1, *et seq.*)." Exs. 3, 6, 9, 12, 15 at 1.

**G.  WPM's Connection to Plaintiffs**

43. On May 22, 2023, WPM, U.S. Auto Sales, and U.S. Auto Finance, Inc. ("U.S. Auto Finance"; collectively with U.S. Auto Sales, "U.S. Auto") and other

parties entered into a tri-party servicing agreement. Attached as **Exhibit 16** is a true and correct copy of the tri-party servicing agreement (the "Tri-Party Servicing Agreement") between WPM and U.S. Auto. The Tri-Party Servicing Agreement authorized WPM to act as U.S. Auto's agent to service the RISCs.

44. On June 21, 2023, the Tri-Party Servicing Agreement was amended to substitute Auto Loan Pool Trust and Auto Holder LLC (the "Owners") as parties to the agreement in place of U.S. Auto. Attached as **Exhibit 17** is a true and current copy of the amended and restated tri-party servicing agreement (the "Amended Midcap Agreement."). In particular, pursuant to the Amended Midcap Agreement, the Owners acquired Contracts, related Receivables, and Financed Vehicles from U.S. Auto pursuant to a sale of U.S. Auto's assets. *See* Ex. 17 at 4.

45. The Amended Midcap Agreement specified that WPM "is hereby authorized to act as an agent for the Owners (and the Lender Agent, as applicable) and in such capacity shall manage, service, administer the Contracts and collect the Receivables, and perform the other actions required by the Servicer under this Agreement. In performing its duties hereunder, the Servicer shall have full power and authority to do or cause to be done any and all things in connection with such servicing and administration which it may deem necessary or desirable, within the terms of this Agreement." Ex. 17 at 11 ¶ 3.1(a).

46. The companies for which WPM was authorized to act as an agent were Auto Loan Pool Trust and Auto Holder LLC. *See id.* at 4, 8 (defining "Owners" to mean Auto Loan Pool Trust and Auto Holder LLC). WPM was defined to mean the "Servicer." *See id.* at 4, 9. The contracts subject to the Amended Midcap Agreement "consist of the Initial Contracts and Additional Contracts added to the coverage of [the Amended Midcap Agreement] on one or more Additional Receivable Coverage Dates." *Id.* at 10 ¶ 2.1(a). "Initial Contracts" include "the Contracts covered by [the Amended Midcap Agreement] as of the Closing Date." *Id.* at 7. "Contracts" include any "motor vehicle retail installment contract executed by an Obligor in connection

with its purchase of a Financed Vehicle from U.S. Auto Sales, Inc., pursuant to which an extension of credit was made by U.S. Auto Sales, Inc. in the ordinary course of its business to such Obligor and which is secured by such Financed Vehicle. A scheduled of the Initial Contracts as of the Closing Date appear[ed] in Schedule A." *Id.* at 5–6. The "Closing Date" means "May 22, 2023." *Id.* at 5. The Hueston, Laney, and Davis Accounts are subject to the Amended Midcap Agreement.

47. In connection with the Amended Midcap Agreement, the Owners executed and delivered powers of attorney to WPM. *See id.* at 18–24. Pursuant to these powers of attorney, the Owners authorized WPM to "file or prosecute any claim, litigation, suit or proceeding in any court of competent jurisdiction or before any arbitrator, or take any other action otherwise deemed appropriate by [WPM] for the purpose of collecting any and all such moneys due to [the Owners] whenever payable and to enforce any other right in respect of the Contracts or the related Financed Vehicles" and engage in "all acts and other things that [WPM] reasonably deems necessary to perfect, preserve, or realize upon the Contracts or the related Financed Vehicles, all as fully and effectively as it might do." *Id.* at 18–19, 21–22.

48. Also on May 22, 2023, WPM, US Auto Warehouse – 003, LLC ("US Auto Warehouse") and two other parties entered into a servicing agreement. Attached as **Exhibit 18** is a true and correct copy of the servicing agreement entered into between WPM and US Auto Warehouse (the "Warehouse Servicing Agreement"). In particular, the Warehouse Servicing Agreement specified that U.S. Auto Warehouse acquired Receivables pursuant to a Loan and Security Agreement. *See* Ex. 18 at 4.

49. The Warehouse Servicing Agreement further specified that WPM "is hereby authorized to act as an agent for the Company and in such capacity shall manage, service, administer and make collections on the Receivables, and perform the other actions required by the Servicer under this Agreement. In performing its duties hereunder, the Servicer shall have full power and authority to do or cause to be done any and all things in connection with such servicing and administration which it

may deem necessary or desirable, within the terms of this Agreement." Ex. 18, at 10 ¶ 3.1(a).

50. The company for which WPM was authorized to act as an agent under the Warehouse Servicing Agreement was US Auto Warehouse. *See id.* at 4–5. (defining "Company" to mean US Auto Warehouse – 003, LLC). WPM was defined to mean the "Servicer." *See id.* at 4, 8. The contracts subject to the Warehouse Servicing Agreement "consist of the Receivables set out in Schedule A hereto." *Id.* at 9 ¶ 2.1(a). "Receivables" included "indebtedness owned by an Obligor under a Contract . . . arising out of or in connection with the sale, refinancing or loan made by [U.S. Auto Finance] . . . with respect to a Financed Vehicle in connection therewith. . . . A schedule of the Receivables as of the Closing Date appears on Schedule A." *Id.* at 7. "Contract" included any "Installment Sale Contract, as such term is defined in the Loan Agreement." *Id.* at 5. The "Closing Date" means "May 22, 2023." *Id.* The Moody and Caines Accounts are subject to the Warehouse Servicing Agreement.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 22 day of April 2024 in Los Angeles, California.

_____
JOHN SCHWARTZ