Kyle D. McLean (SBN: 330580)
kmclean@sirillp.com
Siri & Glimstad LLP
700 S. Flower Street, Suite 1000
Los Angeles, CA 90017
T: (213) 376-3739
F: (646) 417-5967

Lisa R. Considine (*pro hac vice*)
lconsidine@sirillp.com
Siri & Glimstad LLP
745 Fifth Avenue, Suite 500
New York, NY 10151
T: (772) 783-8436
F: (646) 417-5967

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TAMIKA HEUSTON et al., | Case No. 5:24-cv-00380-JGB (SHKx) |
| Plaintiffs, | **PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION** |
| vs. | |
| WESTLAKE PORTFOLIO MANAGEMENT, LLC, | **DATE: June 24, 2024**<br>**TIME: 9:00 a.m** |
| Defendants. | |

# **TABLE OF CONTENTS**

I. PRELIMINARY STATEMENT ..................................................................1

II. RELEVANT FACTUAL BACKGROUND ................................................2

    A. Plaintiffs And Those Similarly Situated Finance Their Purchase of Motor Vehicles From U.S. Auto Sales .................................................2

    B. Westlake Enters As Servicer Of Certain Retain Installment Service Contracts.........................................................................................3

    C. Westlake Seeks To Collect Amounts Not Due And Repossess Vehicles From Plaintiffs .................................................................4

        1. Tamika Hueston ..............................................................4

        2. Bundy Laney ...................................................................5

        3. Cecily Moody..................................................................5

        4. Jattiya Davis ...................................................................6

        5. Danielle Caines ...............................................................6

    D. Plaintiffs' Claims Against Westlake ......................................................8

III. LEGAL ARGUMENT............................................................................8

    A. Legal Standard .......................................................................................8

    B. There Is No Policy Favoring Arbitration................................................8

    C. The Delegation Clause Cannot Be Enforced Before Determining Whether Or Not There Is An Agreement to Arbitrate ........................10

    D. The *McGill* Rule Prevents Arbitration of Plaintiffs' Claims Seeking Public Injunctive Relief.......................................................................11

    E. Westlake Does Not Have Standing To Enforce U.S. Auto's Arbitration Agreements........................................................................13

        1. Westlake Does Not Have Standing to Enforce The Arbitration Agreements As To Plaintiffs Moody and Caines .....................14

PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION

2. Westlake Does Not Have Standing to Enforce The Arbitration Agreements As To Plaintiffs Hueston, Laney and David ........17

3. Westlake Has Failed to Carry Its Burden That There Is A Valid Arbitration Agreement Between Plaintiffs and Westlake .....................................................................................19

F. The Arbitration Agreements Are Unconscionable ..............................20

1. The Arbitration Agreement Is Procedurally Unconscionable ...20

2. The Arbitration Agreement Is Substantively Unconscionable ..21

CONCLUSION .........................................................................................22

CERTIFICATE OF COMPLIANCE.........................................................23

CERTIFICATE OF SERVICE .................................................................23

## I. PRELIMINARY STATEMENT

Plaintiffs Tamika Hueston, Bundy Laney, Cecily Moody, Jattiya Davis, and Danielle Caines ("Plaintiffs") respectfully submit this Opposition to Defendant Westlake Portfolio Management, LLC's ("Westlake") Motion seeking to stay or dismiss[1] this action and compel arbitration pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–16 (the "Motion").

The most fundamental tenet of an arbitration agreement is just that — an *agreement* to arbitrate, by which each party unambiguously waives its constitutional right to a public jury trial. "Absent a ***clear agreement*** to submit disputes to arbitration, courts will not infer that the right to a jury trial has been waived." *Wolschlager v. Fidelity Nat 7 Title Ins. Co.* (2003) 111 Cal.App.4th 784, 789 (emphasis added). Westlake's motion to compel arbitration fails to demonstrate that such an agreement was made as between Westlake and Plaintiffs. To be clear, Plaintiffs did not contract with Westlake. The subject arbitration agreements at issue are between Plaintiffs and U.S. Auto Sales, Inc. ("U.S. Auto Sales"), the entity from which Plaintiffs purchased their motor vehicles. Westlake asserts that through a complex history of sale, assignment, servicing agreements, and powers of attorney, it ultimately acquired the right to enforce the arbitration provisions contained within the U.S. Auto Sales contracts. However, a close look at the servicing agreements themselves reveals fatal evidentiary gaps in Westlake's argument.

Furthermore, Plaintiffs assert a nationwide claim under the California Business and Professions Code seeking public injunctive relief. As such, Plaintiffs cannot be

---

[1] Westlake's Notice of Motion seeks an order "dismissing or staying this action pending completion of the arbitration proceedings." *See* ECF No. 18. However, the proposed Order submitted by Westlake seeks only a dismissal of this action with prejudice. *See* ECF No. 18-1.

compelled to arbitrate their claims under the *McGill* rule, because public injunctive relief is not available to them in an arbitral forum.

Finally, the arbitration agreements are substantively and procedurally unconscionable and, as such, cannot be enforced.

For these reasons, Plaintiffs respectfully submit that this Court should deny Westlake's motion in its entirety.

## II. RELEVANT FACTUAL BACKGROUND

### A. Plaintiffs And Those Similarly Situated Finance Their Purchase of Motor Vehicles From U.S. Auto Sales.

U.S. Auto Sales was a Georgia-based car dealership that operated approximately 39 locations across six states including Georgia, Florida, Tennessee, South Carolina, North Carolina, and Alabama. U.S. Auto Sales offered in-house financing for vehicles through its finance arm, U.S. Auto Finance, Inc. ("U.S. Auto Finance"), commonly referred to as a "buy here, pay here" arrangement. *See* Plaintiffs' Complaint, ECF No. 1 ("Compl."), ¶ 18.

A "buy here, pay here" dealership is a specialized car dealership for buyers who may have a challenging time securing financing to purchase a vehicle. With a buy here, pay here dealership, a consumer can receive "in-house" financing from the dealership itself. These dealerships typically work with car buyers who might not qualify for traditional auto financing, or "subprime" borrowers. *Id.*, ¶ 19. Compared to traditional auto loans, loans offered by buy here, pay here dealerships have significantly higher interest rates. *Id.*, ¶ 21.

Plaintiffs, and those similarly situated, financed their vehicles with U.S. Auto Sales. On April 24, 2023, U.S. Auto suddenly, and without warning, ceased operations. *Id.*, ¶ 20.

### B. Westlake Enters As Servicer Of Certain Retail Installment Service Contracts.

Plaintiffs each executed a Retail Installment Sales Contract ("RISC") with U.S. Auto Sales for the purchase and finance of vehicles. Those RISCs were immediately assigned to U.S. Auto Sales' in-house financing arm, U.S. Auto Finance. *See* Exhibits 4 (Hueston), 7 (Laney), 10 (Moody), 13 (Davis), and 16 (Caines) to the Declaration of John Schwartz ("Schwartz Decl.") submitted by Westlake in support of its Motion.

According to the Schwartz Declaration, on May 22, 2023, U.S. Auto Sales, U.S. Auto Finance (as well as other U.S. Auto entities), Westlake, and a third-party known as MidCap Financial Trust, entered into a Servicer Agreement. *See* Schwartz Decl., Exhibit 16, ECF No. 18-18. That agreement reflects that the "Contracts and all related Receivables, Receivables Files and Financed Vehicles are pledged to Lender Agent [MidCap] as collateral…". *Id.* The agreement further provides that Westlake would act as servicer on behalf of both U.S. Auto and Midcap. *Id.* However, this agreement was later amended. On June 21, 2023, the agreement was amended to reflect that Auto Loan Pool and Trust was assigned the "Contracts and related Receivables and Financed Vehicles" via public sale. *See* Schwartz Decl., Exhibit 17, ECF No. 18-19.

In short, the RISC was an agreement between U.S. Auto Sales and Plaintiffs. U.S. Auto Sales assigned that RISC to U.S. Auto Finance. U.S. Auto Finance then pledged that RISC as collateral to MidCap Financial Trust. That collateral was then sold to Auto Loan Pool and Trust. Westlake asserts that it can enforce the arbitration agreement between Plaintiffs and U.S. Auto Finance by and through a power of attorney granted by Auto Loan Pool Trust and Auto Holder LLC to Westlake. *See* Schwartz Decl., ¶¶ 46–47.

Westlake makes the blanket assertion that Plaintiffs Hueston, Laney and Davis's Accounts are subject to this agreement. *See* Schwartz Decl., ¶ 46. Conspicuously absent from Westlake's motion, however, is the Schedule to that

agreement that includes these Plaintiffs' RISCs. Without such Schedule, there is no evidentiary support for Westlake's assertion that the agreement covers these Plaintiffs' RISCs.

In addition, according to the Schwartz Declaration, on May 22, 2023, U.S. Auto Warehouse – 003, along with Pioneers Gate LLC, Midtown Madison Management LLC, and Westlake Portfolio Management, LLC, entered into a servicing agreement. As an initial matter, nowhere in the Schwartz Declaration does Westlake explain how the RISCs between Plaintiffs and U.S. Auto Sales, which were then assigned to U.S. Auto Finance, ultimately came to be held by U.S. Auto Warehouse – 003, LLC. According to the terms of the Agreement, USASF Servicing LLC entered into a loan and security agreement agreement with US Auto Warehouse – 003, LLC whereby Westlake would perform servicing "with respect to the Receivables as described herein for and on behalf of [US Auto Warehouse – 003, LLC." Westlake asserts that Plaintiffs Moody and Caines are subject to this agreement. *See* Schwartz Decl., ¶ 50. Again, conspicuously absent from Westlake's motion, however, is the Schedule to these agreements that reflects those *receivables* to which it applies.

### C. Westlake Seeks To Collect Amounts Not Due And Repossess Vehicles From Plaintiffs.

#### 1. Tamika Hueston

Plaintiff Tamika Hueston, a Florida resident, purchased a 2017 Nissan Versa from U.S. Auto on February 20, 2023, financing it with 148 bi-weekly payments of $211.25 at a 16.20% APR, which included an unjustifiable $1,814 fee for a Dealer Owned Warranty Company ("DOWC") Service Contract. Compl., ¶¶ 45–47. U.S. Auto never secured this Service Contract for her. *Id.*, ¶ 49. When Westlake began servicing the loan, it was aware of this issue but chose not to credit Ms. Hueston for the payments she made through U.S. Auto's payment portal. *Id.*, ¶¶ 50–52. Despite

her continued efforts to stay current on her payments, Westlake repossessed the vehicle in

August 2023 and demanded $1,257.93 for its return, which Ms. Hueston paid. *Id.*, ¶¶ 54–58. Throughout this ordeal, Westlake persistently and knowingly included the cost of the nonexistent DOWC Service Contract in the amount Ms. Hueston owed. *Id.*, ¶ 59.

### 2. Bundy Laney

Plaintiff Bundy Laney, a Georgia resident, purchased a 2017 Hyundai Sonata from U.S. Auto on April 14, 2023, financing it with 130 bi-weekly payments of $249.65 at an exorbitant APR of 20.43%, resulting in an excessive finance charge of $12,482.50, including an unjustifiable $3,595 fee for a Service Contract. Compl., ¶¶ 60–63.

Despite the Itemization of Amount Financed indicating the purchase of a DOWC Service Contract, U.S. Auto never secured this contract for Mr. Laney, a fact he only discovered when he contacted DOWC on July 14, 2023. *Id.*, ¶¶ 63–64. Westlake was fully aware that the service contract was never secured but unscrupulously included the amount in the total finance price. *Id.*, ¶¶ 65–67. Mr. Laney made payments as agreed to both U.S. Auto and Westlake, despite the deceitful charge for the non-existent service contract. *Id.*

### 3. Cecily Moody

Plaintiff Cecily Moody, a South Carolina resident, purchased a 2018 Chevrolet Sonic from U.S. Auto on June 29, 2022. Compl., ¶ 68. The total cash price included an exorbitant $1,995 fee for a DOWC Service Contract, financed through 154 bi-weekly payments of $264.69 at an unfair APR of 14.95%, resulting in a finance charge of $14,107.91. *Id.*, ¶¶ 69–71. Despite this, U.S. Auto never secured the DOWC Service Contract for her. *Id.*, ¶ 72. Ms. Moody made payments through U.S. Auto's portal until it became inoperative, and she was then directed to remit payments to Westlake, which failed to account for her previous payments. *Id.*, ¶¶ 73–

74. Despite notifying Westlake in June 2023 about the payment discrepancy, Ms. Moody discovered in July 2023 that she did not have the service contract. *Id.*, ¶¶ 75–76. Westlake unjustly rejected her efforts to resolve the payment issue and advised her to direct any future disputes to her bank. *Id.*, ¶¶ 77–79. Westlake continues to demand payment for the non-existent contract that was never secured, while Ms. Moody continues to make bi-weekly payments. *Id.*, ¶¶ 80–81.

### 4. Jattiya Davis

Plaintiff Jattiya Davis, a resident of North Carolina, purchased a 2013 Hyundai Sonata from a U.S. Auto on January 21, 2023. Compl., ¶ 83. Included in the total cash price was a $3,595 fee for a Service Contract. *Id.*, ¶ 84. Ms. Davis financed the vehicle with 144 bi-weekly payments of $242 at an exorbitant APR of approximately 20%. *Id.*, ¶ 85. Although she received an Itemization of Amount Financed indicating a DOWC Service Contract, this contract was never actually secured by U.S. Auto. *Id.*, ¶¶ 86–87.

Westlake was aware of the missing service contract. *Id.*, ¶ 88. Ms. Davis made payments directly to U.S. Auto, only to later discover that her account had not been credited for these payments after it was transferred to Westlake. *Id.*, ¶ 89. Despite her complaints to the CFPB, Westlake unjustly repossessed her vehicle in January 2024 without providing any post-repossession notices. *Id.*, ¶¶ 89–92. Adding insult to injury, Westlake also acknowledged that the amounts due included the unprovided DOWC Service Contract. *Id.*, ¶ 93.

### 5. Danielle Caines

Plaintiff Danielle Caines, a resident of Alabama, purchased a 2012 Chevrolet Equinox from a U.S. Auto on October 13, 2022. *Id.*, ¶ 94. The total cash price included a $3,595.00 fee for a Service Contract, which was financed along with 151 bi-weekly payments of $242.98 at an unfair APR of 17.44%, resulting in a finance charge of $13,994.46. *Id.*, ¶¶ 95–96. Despite the agreement, U.S. Auto failed to secure the promised Service Contract. *Id.*, ¶ 98. Westlake, fully aware of this

egregious oversight when it took over the loan, began managing her payments in May 2023. *Id.*, ¶¶ 99–100. When Ms. Caines reached out to Westlake, she was shocked to discover it was a debt collector and that she supposedly owed approximately $21,000, despite having made regular payments. *Id.*, ¶ 102. On October 19, 2023, Westlake repossessed her vehicle without providing any post-repossession notices, despite knowing that the amount financed included an unfulfilled Service Contract, which was never lawfully owed. *Id.*, ¶¶ 103–105. Westlake not only charged unfair amounts but also failed to apply payments already remitted to outstanding loans, perpetuating an unjust financial burden on Ms. Caines.

### D. Plaintiffs' Claims Against Westlake.

This lawsuit seeks to hold Westlake accountable for its deceptive and exploitative practices as a loan servicer for hundreds, if not thousands, of consumers facing financial hardship. On February 16, 2024, Plaintiffs initiated this action on behalf of themselves and all similarly situated consumers based on Westlake's practices of charging unfair amounts, ignoring fulfilled obligations, and breaching the terms of underlying contracts. On behalf of three proposed classes, Plaintiffs assert in their Complaint that Westlake:

- Violated California's UCL by misrepresenting loan balances and failing to credit payments already made, leading to inflated debt burdens on consumers like Plaintiffs; inflating principal balances owed on the loan; and disregarding payments made (*Id.*, ¶ 4);

- Violated TILA and Regulation Z by offering contracts that failed to accurately itemize the amount financed for DOWC Service Contracts that were not in force (*Id.*, ¶ 6); and

- Violated the UCC by failing to provide notice in connection with the repossession of motor vehicles.

Plaintiffs also assert common law claims against Westlake for unjustly enriching itself by, *inter alia*, preying on consumers' vulnerabilities by inflating debts and ignoring fulfilled obligations.

## III.    LEGAL ARGUMENT

### A. Legal Standard.

In evaluating a motion to compel arbitration where the validity of an arbitration agreement is at issue, district courts rely on the summary judgment standard of Rule 56. *See Hansen v. LMB Mortg. Servs.* (9th Cir. 2021) 1 F.4th 667, 670. As the party moving to compel arbitration, Defendants bear "the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence." *Norcia v. Samsung Telecomms. Am., LLC* (9th Cir. 2017) 845 F.3d 1279, 1283 (quotation omitted).

When a party opposes a motion to compel arbitration on the ground that no agreement to arbitrate was made, the court "should give to the opposing party the benefit of all reasonable doubts and inferences that may arise." *Sanford v. MemberWorks, Inc.* (9th Cir. 2007) 483 F.3d 956, 963 (quoting *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.* (9th Cir. 1991) 925 F.2d 1136, 1141 (cleaned up)); *see also Cordas v. Uber Techs., Inc.* (N.D. Cal. 2017) 228 F. Supp. 3d 985, 988. "Only when there is no genuine issue of fact concerning the formation of the [arbitration] agreement should the court decide as a matter of law that the parties did or did not enter into such an agreement." *Three Valleys*, 925 F.2d at 1141 (citation omitted).

### B. There Is No Policy Favoring Arbitration.

The Federal Arbitration Act requires courts to "place arbitration agreements on an equal footing with other contracts and [to] enforce them according to their terms." *AT&T Mobility LLC v. Concepcion* (2011) 563 U.S. 333, 339. However, the Supreme Court has qualified this statement by reference to "[t]he final phrase of § 2," which is known as the FAA's "saving clause" and which "permits arbitration agreements to be declared unenforceable 'upon such grounds as exist at law or in equity for the

revocation of any contract.'" *Concepcion*, 563 U.S. at 339. This "indicates" that Congress' "purpose" in enacting the FAA "was to make arbitration agreements as enforceable as other contracts, but not more so." *Prima Paint v. Flood & Conklin* (1967) 388 U.S. 395, 404 n.12; *Morgan v. Sundance* (2021) 596 U.S. 411 (explicitly rejecting the notion that arbitration agreements should be given special treatment over ordinary contracts). Thus, arbitration agreements, "[l]ike other contracts," "may be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability.'" *Rent-A-Center, West, Inc. v. Jackson* (2010) 561 U.S. 63, 68. Even if one party contends that the FAA applies to their agreement to arbitrate, the FAA does not apply until the existence of an enforceable arbitration agreement is established under state law principles involving formation, revocation, and enforcement of contracts generally.[2] *Cione v. Foresters Equity Services* (Cal. Ct. App. 1997) 58 Cal.App. 4th 625, 634.

---

[2] Plaintiffs dispute that the RISCs are governed by the choice of law provisions contained therein. Federal courts sitting in diversity look to the law of the forum state in making a choice of law determination. *Ticknor v. Choice Hotels Int'l, Inc.*, 265 F.3d 931, 937 (9th Cir. 2001) *citing Sparling v. Hoffman Constr. Co., Inc.*, 864 F.2d 635, 641 (9th Cir. 1988). "A choice of law clause will not be enforced if the chosen state's law is contrary to a fundamental policy of California and California has the materially greater interest in enforcement." *Nedlloyd Lines B.V. v. Superior Court*, 3 Cal. 4th 459, 466 (1992); *see also Handoush v. Lease Finance Group*, LLC, No. A150863 (1st Dis., Div. 3 Oct. 31, 2019) (refusing to enforce a forum selection clause on public policy grounds because to enforce the law of the forum state would have resulted have resulted in waiver of a jury trial, recognizing that the right to a jury trial is "intimately bound up with the state's substantive decision making and it serves the substantive state policies of preserving the right to a jury trial in the strongest possible terms, an interest eh California Constitution zealously guards").; *See also Am. Online, Inc., v. Superior Court*, 90 Cal. App. 4th 1, 17 (2001) (forum selection risks the non-application of unwaivable provisions the Consumer Legal Remedies Act); *Verdugo v. Alliantgroup*, L.P., 237 Cal. App. 4th 141, 147 (2015) ("contract "purported to waive the unwaivable wage protections the Labor Code provides to California employees"). Where, as here the State of California has an interest in governing the conduct of its corporations by and through, for example, the California Unfair Competition Law, Cal. Bus. & Prof. Code 17200, the state has a public policy interest in avoiding enforcement of choice of law provisions that would abrogate both the substantive rights under the statute as well as the procedural right to a jury trial.

## C. The Delegation Clause Cannot Be Enforced Before Determining Whether Or Not There Is An Agreement To Arbitrate.

Westlake asserts that the delegation clause contained within the arbitration agreements mandates that the question of arbitrability be decided by an arbitrator, not the Court. *See* ECF No. 18 at 19. This is simply incorrect.

On May 24, 2024, the United States Supreme Court issued an opinion *Coinbase, Inc. v. Suski* (2024) ___U.S.___, 2024 U.S. LEXIS 2263, emphasizing that Federal arbitration law is based on the premise that arbitration agreements are fundamentally contracts. *Id*., *8. At its core, *Suski* holds that courts — not arbitrators — should decide whether parties have agreed to arbitrate. *Id.*, *13. Significantly, the Supreme Court rejected the argument that a party could be forced to arbitrate the question of arbitrability where the contract was invalid. *Id.*

In *Suski*, the arbitration agreement contained within Coinbase's User Agreement had a delegation clause, which required disputes about arbitrability to also be decided by an arbitrator (essentially, an agreement to arbitrate arbitrability). *Id.*, *6. However, when the named plaintiffs entered a sweepstakes offered by Coinbase, the official rules for that sweepstakes said that all disputes of any kind would be heard in state or federal courts in California. *Id.*, *6–7. Coinbase and the plaintiffs disputed whether the claims belonged in California court (pursuant to the sweepstakes rules), or whether they had to be arbitrated (pursuant to the User Agreement). *Id.*, *7–*8. They also disputed whether that question was for the Court or the arbitrator to decide. *Id.*, *8. The district court denied Coinbase's motion to compel arbitration and Coinbase appealed to the Ninth Circuit, which held that it was for a court to decide, not an arbitrator. *Id.* The U.S. Supreme Court affirmed, reiterating that arbitration agreements, including delegation clauses, are contracts subject to contract law; and like any contract, a court must first decide that there is a valid agreement to arbitrate before enforcing it. *See id.*, *generally.*

Accordingly, where, as here, the issue of the validity of the arbitration agreement itself is challenged, the Court — not an arbitrator — must first determine whether there is a valid agreement to arbitrate between Plaintiffs and Westlake.

### D. The *McGill* Rule Prevents Arbitration of Plaintiffs' Claims Seeking Public Injunctive Relief.

The arbitration agreements Westlake seeks to enforce prevent Plaintiffs from bringing either a class or representative action in Court, or from seeking any relief that would benefit others. That, in turn, renders them unenforceable at a minimum as to Count One of Plaintiffs' Complaint. Therein, Plaintiffs bring claims under California's Unfair Competition Law, Bus. Prof. Code § 17200, *et seq*. This statute provides the substantive right to public injunctive relief, which Plaintiffs seek here. *See* Compl., ¶¶ 136, 147; *see also* Prayer for Relief, ¶ D. The "primary form of relief available under the UCL to protect consumers from unfair business practices is an injunction." *In re Tobacco II Cases* (Cal. 2009) 207 P.3d 20, 34. In this regard, the UCL provides: "Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction." *See* Cal. Bus. & Prof. Code § 17203.

Based on the California Supreme Court's decision in *McGill v. Citibank* (Cal. 2017) 393 P.3d 85, and the Ninth Circuit's holding in *Blair v. Rent-A-Center* (2019) 928 F.3d 819, referencing *McGill*, the arbitration agreements are invalid and unenforceable. In *McGill*, the plaintiff sought an injunction to protect the public against Citibank's marketing practices. That form of injunctive relief is specifically authorized under the UCL as a substantive remedy. Citibank, however, sought to compel arbitration of all the claims, including the claim seeking public injunctive relief, under the terms of an arbitration agreement that specifically precluded the arbitrator from granting injunctive relief to anyone other than the individual parties to the arbitration. The trial court refused to compel arbitration of the claims for public injunctive relief, but the California Court of Appeals reversed, finding the FAA

preempted state law on this issue. It ultimately ruled that California law does not permit enforcement of any agreement that waives a claim for public injunctive relief, and that the FAA does not require enforcement of such an agreement merely because it is included in an arbitration agreement. As the Ninth Circuit held in *Blair*, citing to *McGill*: "The California Supreme Court found that public injunctive relief available under the UCL ... is [b]y definition ... primarily 'for the benefit of the general public.'" *Blair*, 928 F.3d at 824 (citations omitted).

*Blair* held that *McGill* was not preempted by the FAA. *Id.* at 822. Based on the reasoning in *Blair*, which is consistent with California state law, the arbitration agreements, here, are invalid and unenforceable under *McGill*. The fundamental principal that underlies this rationale is that a plaintiff must be permitted to litigate a claim for injunctive relief in court, rather than arbitration, when the injunction sought is beyond the arbitrator's power to grant, because forcing arbitration would have the effect of vitiating through arbitration the substantive right to an injunction. *See McGill*, 393 P.3d at 95 ("by agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum.") (citing *Mitsubishi Motors v. Soler Chrysler Plymouth* (1985) 473 U.S. 614, 628. Where there is a conflict between arbitration and a statutory injunctive relief remedy designed for the protection of the general public, arbitration is not a suitable forum for a claim for relief that the arbitration proceeding cannot provide.

Here, the arbitration agreements prevent Plaintiffs from asserting their claims as representative claims and force them to arbitrate "on an individual basis." The arbitration agreements also broadly state that "other rights you and we would have in court may not be available in arbitration." This includes rights to public injunctive relief, which Plaintiffs seek. Plaintiffs allege that Defendant should disclose that monies are not owed for DOWC Service Contracts, and that they did not owe monies which were paid but not credited to their loans, unilaterally changed the terms of the

contracts, and misrepresents the amounts owed. Compl., ¶¶ 136–37, 139, 141, 144. Plaintiffs seek enjoinment of these unlawful and/or fraudulent acts or practices. *Id.*, ¶ 147. As a result, the Court cannot compel this matter to arbitration, and must either sever the UCL claims in their entirety or strike the arbitration clause in its entirety, as courts should not "blue-pencil" or re-write and add language to such clauses to now speak of only particular remedies. *Shroyer v. New Cingular Wireless Serv, Inc* (9th Cir. 2007) 498 F. 3d 976, 986-87; *Pitchford v. Oakwood Mobile Homes* (W.D. Va. 2000) 124 F.Supp.2d 958, 965 (striking down entire arbitration clause, holding "courts will look into the intent of the parties to determine severability, [but] they will not 'blue pencil' a contract to make it enforceable.").

The whole purpose of public injunctive relief is to prevent an ongoing wrong that is impacting the public — such as making false statements to convince consumers to pay off loans for amounts that have already been paid. Resolving that issue would have nothing to do with the results of an individual arbitration, and there is no reasonable basis for stripping Plaintiffs of their statutory rights under the UCL. The arbitration agreements are unenforceable because "contractual provisions waiving the right to seek public injunctive relief in any forum are unenforceable." *Keebaugh v. Warner Bros. Ent. Inc.* (9th Cir. Apr. 26, 2024) No. 22-55982, 2024 WL 1819651 (citing *McGill*, 393 P.3d at 87). Because the arbitration agreements in the present case prevent Plaintiffs or any other Class Members from pursuing anything other than claims on "an individual basis," the arbitration agreements impermissibly foreclose the opportunity to seek public injunctive relief in any forum, in violation of the *McGill* rule.

### E. Westlake Does Not Have Standing To Enforce U.S. Auto's Arbitration Agreements.

The central issue before the Court is whether Westlake has standing to enforce U.S. Auto's arbitration provision. It does not. The arbitration provisions at issue provide as follows:

> Any claim or dispute, whether in contract, tort or otherwise (including the interpretation and scope of this clause and the arbitrability of any issue), between **you and us or our employees, agents, successors or assignees**, which arises out of or relates in any manner to the purchase, financing, or lease of your vehicle or any resulting transaction or relationship (including any such relationship with third parties who do not sign this Arbitration Agreement, such as an assignees o the Contract or Lease Agreement) shall, at your or our election (or the election of any such third party), be resolved by neutral, binding arbitration and not by a court action. **(emphasis added).**

Schwartz Decl., ¶ 41.

It is without dispute that "you" refers to Plaintiffs; "we," "us" and "our" refers to U.S. Auto Sales, the Seller/Lessor. Therefore, this arbitration agreement can only be enforced by Westlake if Westlake can demonstrate that it is an "employee, agent, successor or assign."  Westlake's motion papers do not assert or establish that it is any of these things. As such, Westlake has not carried its burden of demonstrating that it has standing to compel arbitration in this matter.

### 1. Westlake Does Not Have Standing To Enforce The Arbitration Agreements As To Plaintiffs Moody And Caines

According to the Schwartz Declaration, on May 22, 2023, U.S. Auto Warehouse – 003, along with Pioneers Gate LLC, Midtown Madison Management LLC, and Westlake Portfolio Management, LLC entered into a servicing agreement. As an initial matter, nowhere in the Schwartz Declaration does Westlake explain how the RISCs between Plaintiffs and U.S. Auto Sales, which were then assigned to U.S. Auto Finance, ultimately came to be held by U.S. Auto Warehouse – 003, LLC.

1    According to the terms of the Agreement, USASF Servicing LLC entered into

2    a loan and security agreement with US Auto Warehouse – 003, LLC whereby

3    Westlake would perform servicing "with respect to the Receivables as described

4    herein for and on behalf of [US Auto Warehouse – 003, LLC." "The company for

5    which WPM was authorized to act as an agent under the Warehouse Servicing

6    Agreement was US Auto Warehouse." *See* Schwartz Decl., ¶ 50. Westlake asserts

7    that Plaintiffs Moody and Caines are subject to this agreement. *Id.* But in the absence

8    of evidence that Plaintiffs Caine and Moody's Accounts were held by U.S. Auto

9    Warehouse "U.S. Auto Warehouse"), the agreement at Exhibit 18 is irrelevant to

10   Westlake's motion.

11   What Westlake fails to demonstrate, however, is that the Moody and Caines

12   Accounts were ever held by U.S. Auto Warehouse to begin with. As set forth in

13   Exhibits 10 and 16, the RISCs were immediately assigned from U.S. Auto Sales, Inc.

14   to its in-house financing arm, U.S. Auto Finance. *See* Schwartz Decl. at Exs. 10 and

15   16. Westlake presents a servicing agreement between US Auto Warehouse and

16   Westlake, but never explains how Plaintiffs Moody and Caines' Accounts were

17   assigned to US Auto Warehouse to begin with. Nor were the schedules[3] of

18   receivables which are governed by this agreement included — if they even exist.

19   Indeed, the only evidence put forth by Westlake that the Moody and Caines'

20   Accounts are governed by a servicing agreement is the otherwise unsupported

21   statements contained within the Schwartz Declaration, which — standing alone — is

22   insufficient to carry Westlake's burden.  *See Powell v. UHG I LLC* (S.D. Cal. Dec.

23   29, 2023) 2023 U.S. Dist. LEXIS 231197, at *6 (finding that "[a] conclusory self-

24   serving declaration, without more, cannot satisfy defendant's burden" in moving to

25   compel arbitration under a summary judgment standard).

26   _____

27   [3] We further note that raising new facts on reply is improper. *Hooks v. Target Corp.*,
2023 U.S. Dist. LEXIS 127709; *Lujan v. National Wildlife Federation*, 497 U.S. 871,

28   894-95 (1990)). To the extent Westlake attempts to correct this or any other fatal
evidentiary defect on reply, the Court should not consider it.  *Id.*

For example, in *Powell*, the defendants sought to compel arbitration pursuant to a loan agreement. 2023 US Dist. LEXIS 231197, at *3. There was no dispute that the loan agreement contained an arbitration provision. The dispute instead centered on whether the defendant had standing to invoke that arbitration provision. *Id*. The defendant asserted that it had purchased the plaintiff's account and was assigned the rights of the original lender. *Id*., at *2. Before the loan agreement was executed, the sole member of the lender entered into a sale agreement with a third-party. That third-party then assigned its rights to its wholly-owned subsidiary. *Id*., at *3. Less than a month later, a new entity executed another assignment by which it assigned its rights under the sale agreement to its wholly-owned subsidiary. *Id*., at *2. There was no evidence explaining how the "new" entity acquired any rights to begin with under the sale agreement. The court denied defendant's motion to compel arbitration, finding that defendant's self-serving declarations alone were insufficient to establish that the defendant had acquired the right to enforce the arbitration provision at issue. *Id*., at *6–7.

*Powell* is analogous to the present circumstances. Here, Westlake asserts that it obtained servicing rights to the Moody and Caines Accounts by virtue of the servicing agreement annexed at Exhibit 18 to the Schwartz Declaration. However, there is no evidence explaining how US Auto Warehouse acquired any rights to the Moody and Caines accounts or how those accounts were its to assign.

The court in *Powell* recognized the assertions of the lender to be self-serving, as there was nothing before the court that actually evidenced that the loan at issue was subject to the agreement presented to the court. *Id*., at *5. Similarly, the court in *Powell* recognized that there was no evidence that explained the transfer or assignment of rights between the entity that acquired the rights initially, and the "new entity" that seeming acquired and then transferred those rights. As such, the *Powell* court found that there was no absence of a genuine issue of material fact concerning

the defendant's status as an assignee of the loan agreement at issue, and the court denied defendant's motion to compel arbitration. *Id*. at *6.

This Court should reach the same logical conclusion. Again, Westlake has not presented any evidence that the Caines or Moody accounts were ever held by US Auto Warehouse to begin with. The Warehouse Agreement indicates that US Auto Warehouse acquired certain receivables pursuant to a loan and security agreement on December 7, 2020, and perhaps again on February 22, 2022, but in either scenario, prior to the execution of the Caines and Moody RISCs. As such, the Caines and Moody RISCs could not have been included in that agreement. *See Powell*, *supra*, at *6 (recognizing that where assignment pre-dated loan agreement, the loan agreement at issue could not have been assigned). And even if they were assigned — which, the evidence presented demonstrates they were not — Westlake has not presented any evidence that US Auto Warehouse then transferred those specific accounts to Westlake for servicing under this agreement because Westlake failed to include the schedule of receivables that is governed by the assignment. *See* Schwarz Decl. at Ex. 18. And even if the servicing of the Caines and Moody receivables could have been transferred under this agreement, the servicing of receivables is not equivalent to acting as an assignee or agent of the RISC. A limited grant of servicing rights that is restricted to the servicing of receivables only is a far cry from a grant of full authority to step into the shoes of U.S. Auto for purposes of invoking the arbitration provision in its RISCs.

Therefore, Defendant's motion to compel arbitration as to Plaintiffs Caines and Moody must be denied.

### 2. Westlake Does Not Have Standing to Enforce The Arbitration Agreements As to Plaintiffs Hueston, Laney And Davis

As set forth above, on May 22, 2023, U.S. Auto Sales, U.S. Auto Finance (as well as other U.S. Auto entities), Westlake, and a third-party known as MidCap Financial Trust entered into a Servicer Agreement. *See* Schwartz Decl. at Ex. 16,

17

ECF No. 18-18. That agreement reflects that the "Contracts and all related Receivables, Receivables Files and Financed Vehicles are pledged to Lender Agent [MidCap] as collateral…". *Id.* The agreement further provides that Westlake would act as servicer on behalf of both U.S. Auto and Midcap. *Id.* However, this agreement was later amended. On June 21, 2023, the agreement was amended to reflect that Auto Loan Pool and Trust then became owners of the "Contracts and related Receivables and Financed Vehicles" via public sale. *See* Schwartz Decl. at Exhibit 17, ECF No. 18-19. Those Contracts, related Receivables and Financed Vehicles that are governed by the agreement, are listed on a schedule to the agreement. While Westlake makes the blanket assertion that Plaintiffs Hueston, Laney, and Davis Accounts are subject to this agreement, Westlake fails to include the schedule that purportedly supports that position. *See* Schwartz Decl., ¶ 46.

Westlake's failure to include evidence that the Heuston, Laney, and Davis accounts are subject to this agreement is material. As set forth above in Section D.1, the failure to include evidence that establishes that the Hueston, Laney and Davis' RISCs are subject to the agreement is a fatal to Westlake's motion. *See Powell*, *supra*, at *5. Having failed to carry its burden, Westlake's motion to compel arbitration must be denied.

Furthermore, Westlake asserts that it can enforce the arbitration agreement between Plaintiffs and U.S. Auto Finance by and through the power of attorney ("POA") granted by Auto Loan Pool Trust and Auto Holder LLC to Westlake. *See* Schwartz Decl., ¶¶ 46–47. It cannot.

The POA authorized Westlake, in part, to "file or prosecute any claim, litigation, suit or proceeding in any court of competent jurisdiction or before any arbitration, or take any other action deemed appropriate by [Westlake] for the purpose of collecting any and all such monies due to [Owners] whenever payable and to enforce any other right in respect of the Contracts or the related Financed Vehicles." *See* Schwartz Decl., ¶ 47, Ex. 17. at 18, 21. Here, Westlake's actions are

not within the scope of the POA. Westlake has not filed, prosecuted, or taken any action "for the purpose of collecting any and all such monies due to [Owners]" or to enforce any rights in connection with the Contracts. Rather, it is *Plaintiffs* who have initiated suit against Westlake related to Westlake's bad acts. The POA grants Westlake the power to *defend* suits, but only those brought against the Grantors (Auto Loan Pool Trust and Auto Holder LLC). *Id*. The POA is not unlimited. Where a POA does not specifically authorize the appointed attorney to undertake certain action, it cannot do so.  *See Logan v. Country Oaks Partners*, *LLC* (Cal. Ct. App., 2022) 82 Cal. App. 5th 365.

Therefore, Defendant's efforts to compel Plaintiffs Laney, Bundy, and Davis to arbitration must be denied.

### 3. Westlake Has Failed to Carry Its Burden That There Is A Valid Arbitration Agreement Between Plaintiffs And Westlake

Westlake cannot compel arbitration on the allegations of Plaintiffs' Complaint alone, particularly where Westlake has introduced outside evidence to support its motion.  *See Powell v. UGH I LLC* (S.D. Cal. Dec. 29, 2023) 2023 U.S. Dist. LEXIS 231197 (where the parties have submitted evidence outside the pleadings, including declarations and exhibits, the moving party must show there is no genuine issue of material fact and that it is entitled to an order compelling arbitration as a matter of law). It is well-settled that the party seeking to compel arbitration bears the burden of demonstrating that the parties assented to the terms of the arbitration agreement and that a valid agreement to arbitrate exists. *See Banner Entertainment, Inc. v. Superior Court* (1998) 62 Cal.App.4th 348, 356. Courts will not infer an agreement to arbitrate absent a "clear agreement." *Davis v. Nordstrom, Inc.* (9th Cir. 2014) 755 F.3d 1089, 1092 (citing *Avery v. Integrated Healthcare Holdings, Inc.* (2013) 218 Cal.App.4th 50, 59).

While Plaintiffs have alleged that Westlake is a servicer/assignee in their Complaint, this is of no moment to Westlake's Motion. Westlake has put forth evidence that contradicts that allegation. *See* Schwartz Decl. at Ex. 18, ECF No. 18-19, ¶ 18.16 "[u]nless expressly authorized by this Agreement, [Westlake] shall have no authority to act for or represent [Auto Loan Pool Trust and Auto Holder LLC] or [Midcap Financial Trust] in any way and shall not otherwise be deemed an agent of the [[Auto Loan Pool Trust and Auto Holder LLC] or [Midcap Financial Trust]." Furthermore, while Westlake relies on certain servicing agreements annexed to the Schwartz Declaration, Westlake fails to include the Schedules to those agreements that would evidence whether Plaintiffs' RISCs, or receivables, are in fact governed by those agreements. Nor does Westlake explain how the limited right to service certain receivables under a contract is tantamount to being a party to the contract itself.

Simply put, Westlake has failed to carry its burden of demonstrating that there is an enforceable agreement to arbitrate between Westlake and Plaintiffs.

### F. The Arbitration Agreements Are Unconscionable.

#### 1. The Arbitration Agreement Is Procedurally Unconscionable

The arbitration agreements are unenforceable because they are both procedurally and substantively unconscionable. The California Supreme Court, in *Sonic-Calabasas A. Inc. v. Moreno* (2013) 57 Cal.4th 1109, 1142 held that "unconscionability remains a valid defense to a petition to compel arbitration" even after the U.S. Supreme Court decision in *Concepcion*. Procedural unconscionability concerns the manner in which the contract was negotiated and the respective circumstances of the parties at that time, focusing on the level of oppression involved in the agreement. *See Kinney v. United Healthcare Services, Inc.* (1999) 70 Cal.App.4th 1322, 1329; *A & M Produce Co. v. FMC Corp.* (1982) 135 Cal.App.3d 473, 486. Oppression addresses the weaker party's absence of choice and unequal bargaining power that results in "no real negotiation." *A & M Produce*, 135

Cal.App.3d at 486. Procedural unconscionability is often found in contracts of adhesion. *Sanchez v. Valencia Holding Co., LLC* (2015) 61 Cal. 4th 899, 915.

A "meaningful opportunity to negotiate or reject the terms of a contract requires, at a minimum, that a party have reasonable notice of the opportunity to negotiate or reject the terms of the contract and an actual, meaningful, and reasonable choice to exercise that discretion." *Circuit City Stores, Inc. v. Mantor* (9th Cir. 2003) 335 F.3d 1101, 1106. In *Harper v. Ultimo* (2003) 113 Cal.App.4th 1402, 1406, the court held it was oppressive to reference the Better Business Bureau arbitration rules without attaching the rules to the agreement. "The customer is forced to go to another source to find out the full import of what he or she is about to sign-and must go to that effort prior to signing." *Id.* "Numerous cases have held that the failure to provide a copy of the arbitration rules to which the employee would be bound supported a finding of procedural unconscionability." *Trivedi v. Curexo Technology Corp.* (2010) 189 Cal.App.4th 387, 393. Here, RISCs are routinely presented to auto consumers as a "take it or leave it" agreement (i.e., an adhesion contract) in a high-pressure sales environment, and the form arbitration provisions non-negotiable. This most certainly was the case for Plaintiffs, where they were not provided any option to negotiate the terms of the RISC and were not provided with a copy of the AAA Rules governing arbitration. *See* Schwartz Decl. at Exs. 3, 6, 9, 12, and 15. This is significant, and sufficient for a finding of procedural unconscionability. Therefore, this Court should find the provision procedurally unconscionable.

### 2.  The Arbitration Agreement Is Substantively Unconscionable

Substantive unconscionability exists when the terms of the contract are unduly harsh, oppressive, or one-sided and outside the expectations of non-drafting party. *See Sanchez*, 61 Cal.4th at 911. The alleged arbitration clause allows for a choice of arbitrator but only so long as the selling dealer or creditor approves the choice. The Court in *Chavarria v. Ralphs*, (9th Cir. 2013) 733 F. 3d 916 specifically held that an arbitration selection process that always favors an employer — like here where US

Auto must approve the arbitrator — renders the agreement substantively unconscionable. *Id.* at 925–26. Here, the arbitration agreements state: "You may choose the American Arbitration Association . . . or another arbitration organization, **subject to our approval**." *See* Schwartz Decl., Exhs. 3, 6, 9, 12, and 15. This is a classic example of a false choice. This clause seeks to deprive Plaintiffs of their fundamental and constitutional right to a jury trial, leading to an unconscionable result.

## **CONCLUSION**

For the foregoing reasons, we respectfully request that the Court deny Defendant's motion to compel Plaintiffs' claims to arbitration in its entirety.

DATED: June 3, 2024

Respectfully submitted,

/s/*Kyle D. McLean*

Kyle D. McLean (SBN: 330580)
kmclean@sirillp.com
Siri & Glimstad LLP
700 S. Flower Street, Suite 1000
Los Angeles, CA 90017
T: (213) 376-3739
F: (646) 417-5967

Lisa R. Considine (*pro hac vice*)
lconsidine@sirillp.com
Siri & Glimstad LLP
745 Fifth Avenue, Suite 500
New York, NY 10151
T: (772) 783-8436
F: (646) 417-5967

*Attorneys for Plaintiffs*

1

## **CERTIFICATE OF COMPLIANCE**

2

3

The undersigned, counsel of record for Plaintiffs, hereby certifies that this brief contains 6,999 words, which complies with the word limit of L.R. 11-6.1.

4

## **CERTIFICATE OF SERVICE**

5

6

7

I certify that on June 3, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will automatically send notification of filing to all counsel of record.

8

_____/s/ *Lisa R. Considine*_____

9

Lisa R. Considine

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28